UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jeffrey Meisner, Esq., <br><br>                Plaintiff, <br><br>    v. <br><br>JPMorgan Chase Bank, N.A., <br><br>                Defendant. | No. 2:20-cv-01766-KJM-CKD <br><br> ORDER |

    Jeffrey Meisner, an attorney, alleges his former bank, JPMorgan Chase, persuaded him to open an account by promising to protect him from fraud, but then overlooked a fraudulent check scheme that resulted in a $135,000 loss. The court previously dismissed his complaint but permitted him leave to amend. Chase moves again to dismiss. The court held a hearing by videoconference on February 5, 2021. Jeffrey Meisner appeared on his own behalf with his colleague William McLaughlin. Arjun Rao appeared for Chase.

    The amended complaint does not cure the deficiencies identified in this court's previous order, and Meisner's factual allegations often contradict the documents attached to his complaint, including the express terms of the contract that governed his banking relationship with Chase. The motion to dismiss is **granted without leave to amend**.

/////

1

## I.  ALLEGATIONS

Meisner started his law practice in February 2018 after working in-house.  First. Am. Compl. (FAC) ¶ 9, ECF No. 15.  He opened an Interest on Lawyers' Trust Account (IOLTA) at Chase.  *Id.* ¶ 10.  He also opened a Chase personal checking account, personal savings account, business operating account, and a retirement account using rollover funds.  *Id.*  This earned him "Private Client" status.  *Id.*  "Private Client" is a brand name for Chase's premium banking and investment offerings.  *See, e.g.*, "Deposit Products & Services," *id.* Ex. A at 79; "Chase Private Client" (Nov. 2017), *id.* Ex. A at 84.[1]  Private Clients enjoy a number of benefits not available to other account holders, such as a dedicated phone number, a personal banker, and advisory services.  *See* "Chase Private Client" (Nov. 2017), *id.* Ex. A at 80–98.

About a year after Meisner began banking with Chase, he deposited a $135,000 cashier's check into the client trust account.  *Id.* ¶ 13.  His amended complaint does not say where the check came from or why he received it, and he did not attach a copy.  Chase, however, has filed a copy of a cashier's check for $135,000 that was deposited by ATM into Meisner's account on the day in question, and Meisner's signature is on the back.  *See* Req. J. Not. Ex. A, ECF No. 17-1.  The check was issued by "The Toronto-Dominion Bank," identifies "Gavin Brokerage LLC" in the "re" line, and names "Wells Fargo Bank, N.A." in the "to" line.  *Id.*  Meisner does not dispute the authenticity of this copy.  The court may therefore consider it here without converting Chase's motion into a motion for summary judgment.  *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Chase placed a hold on the $135,000 deposit.  FAC ¶ 14.  It sent a notice of that hold to Meisner and explained that it believed the check was potentially altered or fraudulent.  *Id.*  Meisner called Chase to ask about the hold and the notice.  *Id.* ¶ 15.  A "business banker" said Chase would need time to investigate and asked for more information about the check, which Meisner provided.  *Id.*  Chase removed the hold the next day.  *Id.* ¶ 17.  An unnamed employee told Meisner the check was not altered or fraudulent; according to that employee, Chase had

---

[1] To avoid confusion, this order cites Exhibit A to the amended complaint using the page numbers applied by the court's CM/ECF system to the top right of each page.

"verified" the check with Wells Fargo. *Id.* ¶ 16. After Chase removed the hold, Meisner wired more than $100,000 from the trust account to a third party. *Id.* ¶ 17.

The next business day, Chase deducted $135,000 from the client trust account, leaving it with a negative balance. *See id.* ¶¶ 19, 52.1.[2] It had discovered the check was not valid after all. *Id.* ¶ 19. Meisner was forced to take money from his other accounts to cover the loss, including by making early withdrawals from his individual retirement account. *See id.* ¶ 52.2. As a result, he incurred tax penalties, lost financial gains and other benefits of the withdrawn funds, and spent money finding a new bank. *See id.* He was also forced to defend his state bar license in an investigation[3] and has spent money on litigation. *See id.*

Meisner sued Chase and twenty unnamed Doe defendants in Sacramento County Superior Court. *See* Compl., Not. Removal Ex. A, ECF No. 1-1. Chase removed the action to this court and moved to dismiss. *See* Not. Removal, ECF No. 1; Mot. Dismiss, ECF No. 5. The court granted that motion with leave to amend. *See* Prev. Order, ECF No. 14. The case is now proceeding on Meisner's amended complaint, which asserts the following claims, all under California law:

- A contract claim based on alleged breaches of express and implied contract terms, including the implied covenant of good faith and fair dealing, FAC ¶¶ 21–36;
- A tort claim for negligence based on common law and assumed duties of care, *see id.* ¶¶ 42–56;
- Tort claims for fraud based on allegations of negligent misrepresentation and false promise, *id.* ¶¶ 57–66;
- An equitable claim for promissory estoppel, *id.* ¶¶ 37–41; and
- Statutory claims for unfair and fraudulent business practices in violation of California Business & Professions Code section 17200, *id.* ¶¶ 67–79.

---

[2] The complaint includes two paragraphs labeled "52." This order cites the first as paragraph 52.1 and the second as paragraph 52.2.

[3] The court takes judicial notice of Meisner's California Bar profile, which currently shows he is a member in good standing. *See White v. Martel*, 601 F.3d 882, 885 (9th Cir. 2010) (taking judicial notice of membership information reported on the California State Bar website).

Meisner also attached several documents to his amended complaint. *See id.* Ex. A. The first is his "Deposit Account Agreement" with Chase. *See id.* at 17–46. It includes several provisions about Chase's rights and obligations when an account holder deposits a check:

- The agreement permits Chase to "refuse a deposit, or part of a deposit, at any time," even after "initially accepting it." *Id.* at 21.
- The agreement warns that "[i]f funds from a deposit become available" and can be withdrawn, "that does not mean the check . . . is 'good,' has 'cleared,' or has been paid by the paying bank." *Id.* at 22. A check may "be returned unpaid" long after Chase has made funds available and the account holder has withdrawn them, even months later. *Id.* And "[n]o one, including [Chase] employees, can guarantee" to an account holder "that a check will not be returned." *Id.*
- Chase accepted a "responsibility . . . to exercise reasonable care" when sending a deposited check for collection. *Id.* It also acknowledged that it "attempt[s] to identify and prevent fraudulent transactions." *Id.* But it disclaimed any duty "to determine whether any check" is "forged, counterfeit, altered, improperly endorsed or otherwise improper." *Id.*
- Chase preserved its right to "subtract" money from the accountholder's balance in several circumstances, including, for example, if a paying bank demands repayment because a check was forged or unauthorized. *See id.* The agreement also makes clear that this warning applied to attorney trust accounts: if account holders deposit a check "in [their] trust account (including any attorney trust account) and it is returned, [Chase] may charge [the] trust account or [another] account," even if the attorney has "already withdrawn the funds." *Id.*

Chase changed some terms of the Deposit Account Agreement after Meisner opened his accounts, but none of those changes are relevant here. *See* Deposit Account Agreement—Change in Terms (Mar. 2018), *id.* Ex. A at 64.

The amended complaint also attaches several documents related to business accounts and Chase's Private Client brand. Among these documents is a booklet of contract terms that is a part

4

of the Deposit Account Agreement for Private Clients; other parts of these documents relate to business accounts. *See id.* at 19, 47–59, 65–66, 69–79. The documents provide details about various products and services, such as checking and savings accounts, certificates of deposit, and overdraft services. *See, e.g.,* "Deposit Products and Services," *id.* Ex. A at 69–79. The amended complaint's attachments also include what appear to be promotional pamphlets about Private Client offerings. *See id.* at 80–134. For the most part, these pamphlets do not include detailed terms or conditions, and they often refer to the Deposit Account Agreement and other agreements for more information or details. *See, e.g., id.* at 85, 115, 120, 122, 123. There are exceptions, but those exceptions are not relevant to Meisner's claims here. *See, e.g., id.* at 134 (explaining fees, penalties, and interest terms).

Chase moved again to dismiss under Rule 12(b)(6), and briefing is complete. *See* Mot., ECF No. 16; Opp'n, ECF No. 20; Reply, ECF No. 21. The court held a combined hearing and status (pretrial scheduling) conference on February 5, 2021. *See* Minutes, ECF No. 22.

## II.  LEGAL STANDARD

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The motion may be granted only if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory. *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013). The court assumes these factual allegations are true and draws reasonable inferences from them. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted. *Id.* at 679.

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible. *Iqbal*, 556 U.S. at 678. In the same vein, conclusory or formulaic recitations of elements do not alone suffice. *Id.* This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense." *Id.* at 679.

### III. DISCUSSION

#### A. Contract Claims

Meisner advances three contract claims: breach of an express contract term, breach of an implied contract term, and breach of the implied covenant of good faith and fair dealing. *See* FAC ¶¶ 21–36. The court previously dismissed Meisner's contract claims in light of the unambiguous terms in the Deposit Account Agreement. *See* Prev. Order at 2. Here, again, the amended complaint does not plead a viable theory for recovery under California contract law.

Breach is an essential element of every contract claim. *See Green Valley Landowners Ass'n v. City of Vallejo*, 241 Cal. App. 4th 425, 433 (2015). Meisner's allegations do not permit a plausible inference of breach. Although Chase's Deposit Account Agreement acknowledges the bank's duty to use "reasonable care" when sending checks for collection, and although Chase agreed it would "attempt to identify and prevent fraudulent transactions," it expressly disclaimed any duty to determine whether a check is forged or improper. FAC Ex. A at 22. The agreement also warned Meisner unambiguously (1) that a check might turn out to be a fraud even if money could be withdrawn, (2) that no one, not even Chase's own employees, can guarantee a check will not be returned, (3) that Chase can refuse a deposit even after accepting it, and (4) that Chase can subtract funds from an attorney's trust account if a deposited check turns out to be forged or unauthorized. *See id.* at 21–22.

Meisner also alleges Chase "expressly" agreed to place a hold on deposits until it determined they were "valid and not fraudulent." *See id.* ¶ 23. But the documents attached to the amended complaint do not include such an agreement. As he conceded at hearing, those documents permit Chase to place holds; they do not require it to do so. *See id.* Ex. A at 20 (defining a hold and warning that "[a] hold may be placed for more than your balance"); *id.* at 22 ("[W]e may place a hold on the funds . . . ."); *id.* at 23 ("[W]e may place a hold on your account for the check amount."). In addition, as summarized above, the Deposit Account Agreement states clearly that Chase has no duty to determine whether a check is a fraud or "otherwise improper." *Id.* at 22 § 11. Because Meisner's allegation contradicts a document he attached to

/////

1    his amended complaint, that allegation is not assumed to be true. *Sprewell v. Golden State*
2    *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

3          For the same reasons, Meisner cannot succeed by alleging Chase broke a contractual
4    promise to use reasonable care in detecting fraudulent checks. *See* FAC ¶¶ 22–23. Chase did not
5    agree to detect fraud, and it warned account holders that Chase employees could not guarantee
6    that deposited checks would not be returned. *See id.* Ex. A at 21–22. But even if Chase had
7    agreed to determine, using reasonable care, whether deposited checks were fraudulent, Meisner's
8    allegations would not permit a plausible inference that Chase breached that promise. He does not
9    allege facts that, if true, might show that Chase did not exercise due care. He alleges simply that
10   Chase did not detect the fraud, then advocates a conclusion: this was a failure to use reasonable
11   care. *See* FAC ¶ 23. The court does not assume legal conclusions such as this are true in
12   response to a motion under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678.

13         Contrary to Meisner's arguments at hearing, the booklets and pamphlets about Chase's
14   Private Client services do not include any contrary contract terms. For example, Meisner quotes
15   language describing Private Client products as offering "premium banking from Chase combined
16   with the expertise and investment capability of J.P. Morgan" and inviting readers to "explore the
17   special privileges and services" offered to "Chase Private Clients." *See* Opp'n at 2 (quoting FAC
18   Ex. A at 128). Another page cited in his brief describes the "dedicated team" of "specially trained
19   professionals" available to Private Clients, including a "Private Client Banker." *See id.*; FAC Ex.
20   A at 83. This Private Client Banker "seamlessly connects" customers "with other experts," such
21   as home lending advisors and business relationship managers. *Id.* at 85. But these vaguely
22   worded offerings do not impose a duty to investigate deposits, enforce holds, detect check fraud,
23   or preserve funds in trust accounts if deposits are rejected. None of the amended complaint's
24   attachments describe any fraud-detection expertise or services related to check deposits. The only
25   two fraud-prevention services they describe would not have prevented the check fraud here. *See*
26   *id.* at 49 (describing a complimentary service for monitoring outgoing checks signed by the
27   /////
28   /////

7

account holder); *id.* at 85–86 & n.6 (advertising "Real time fraud monitoring," which relates to debit card transactions that are "out of character").[4]

Meisner argues similarly that the Deposit Account Agreement is ambiguous in light of the premium service Chase promises to its Private Clients. *See* Opp'n at 4–6. But "[a]n agreement is not ambiguous merely because the parties (or judges) disagree about its meaning." *Abers v. Rounsavell*, 189 Cal. App. 4th 348, 356 (2010). "[W]ritten agreements whose language appears clear in the context of the parties' dispute are not open to claims of 'latent' ambiguity." *Id.* (quoting *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006)). If the contract is not "'reasonably susceptible' to the interpretation urged," then "the case is over." *S. Cal. Edison Co. v. Superior Court*, 37 Cal. App. 4th 839, 847–48 (1995) (quoting *Consol. World Invs., Inc. v. Lido Preferred Ltd.*, 9 Cal. App. 4th 373, 379 (1992)). Any extrinsic evidence a party offers to prove an ambiguity—such as the Private Client documents Meisner attached to his amended complaint—must also be tethered to specific contract language. *See Alameda Cty. Flood Control v. Dep't of Water Res.*, 213 Cal. App. 4th 1163, 1188–89 (2013). This is "essential." *Id.* at 1188 (emphasis omitted). Here, the relevant terms of the Deposit Account Agreement are clear and unambiguous on their face, as discussed above. Meisner does not explain what terms in the Deposit Account Agreement are ambiguous. He does not tie his extrinsic evidence to specific terms. And contrary to his argument in opposition, *see* Opp'n at 6, the existence of an ambiguity is a question of law, not fact. *See WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1710 (1996). It may be resolved "on a motion to dismiss if the evidence can properly be considered under Rule 12(b)(6)," as it can here. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017–18 (9th Cir. 2012).

Meisner's claim for breach of an express contract term is therefore not viable. The same is true of his two remaining contract claims, implied contract and breach of the implied covenant of good faith and fair dealing. Neither an implied contractual term nor the implied covenant of

---

[4] Meisner also alleges Chase agreed to exercise its discretion to his benefit. *See* FAC ¶ 22; Opp'n at 7. At hearing, he clarified that Chase did not agree to exercise "discretion" in his favor, but rather that such a term may be implied. As discussed below, an implied term may not contradict an express term, so his discretion allegation cannot support his claims.

good faith and fair dealing can be enforced in contradiction of an express contract term. *See Carma Developers* (*Cal.*)*, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992); *Series AGI W. Linn of Appian Grp. Inv'rs DE, LLC v. Eves*, 217 Cal. App. 4th 156, 168–69 (2013). Here, both of Meisner's implied contract claims would in practice require Chase to maintain a hold until it determined that every check was not a fraud despite the express contract term disclaiming those duties. *Compare* FAC ¶¶ 28, 34 *with id.* Ex. A at 21–22. Both claims would also make Chase accountable if its employees incorrectly told an account holder that a check was "good" or "valid," but the Deposit Account Agreement provides expressly that its employees cannot make that guarantee. *Compare* FAC ¶¶ 28, 34 *with id.* Ex. A at 21–22.

      Check scams like the fraud that befell Meisner are disappointingly common, as Chase points out. *See* Mot. at 5–6. Courts both inside and outside California have been asked to decide whether a bank can reclaim withdrawals from an account holder who unknowingly deposited a fake check, including attorneys. One example is the California Court of Appeal's unpublished decision in *Mechanics Bank v. Methven*, No. A136403, 2014 WL 4479741 (Cal. Ct. App. Sept. 12, 2014).[5] In that case, an attorney had fallen victim "to an email scam in which a 'client' soliciting his services persuaded him to accept a counterfeit cashier's check, . . . deposit that check in his account . . . , and wire the money overseas, where it was never to be seen again." *Id.* at *1. After the bank learned the check was counterfeited, it charged back the amount from the attorney's trust account and took money from his other accounts to offset the resulting overdraft. *See id.* Even with these offsets, however, the bank was not whole, so it pursued claims against the attorney and eventually prevailed in obtaining the unpaid balance under a contract theory. *See id.* at *3–4, 13–17. This was so despite the attorney's cross-complaint for negligence, negligent misrepresentation, breach of contract, and unfair business practices. *See id.*

/////

---

[5] Although the California Rules of Court would prohibit the citation of this unpublished decision in a state court, those rules do not apply in federal courts, which may review and consider unpublished appellate decisions for their persuasive, but not precedential, value. *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 942 n.4 (9th Cir. 1997); *Inland Concrete Enters., Inc. v. Kraft*, 318 F.R.D. 383, 405–06 (C.D. Cal. 2016).

1    Although the Court of Appeal's decision in *Mechanics Bank* is not precedent, it explains
2    why deposit agreements are enforceable against attorney account holders in circumstances such
3    as those alleged here. It also mirrors decisions in other courts. One federal district court has even
4    described the legal theory Meisner advances here as the "heartland" of unsuccessful contract
5    claims against banks. *See Taylor Anderson. LLP, v. U.S. Bank Nat'l Ass'n*, No. 13-1336, 2014
6    WL 1292804 at *4 & n.2 (D. Colo. Mar. 31, 2014). In these cases, a bank tells an account holder
7    that a large check has cleared, the account holder believes incorrectly that the check was not a
8    fraud but a fraud is then discovered, the bank reclaims the funds, and the account holder pursues
9    unsuccessful legal claims in an attempt to recover the loss in the face of an unambiguous and
10   contrary deposit agreement. *See id.*

11   Meisner's contract claims are not viable. The motion to dismiss those claims is granted.

**B.     Negligence**

13   Meisner also asserts negligence claims. As this court held in its previous order, California
14   law bars tort recoveries "'for purely economic losses that may be recovered in a contract action,'
15   such as those Meisner requests here." Prev. Order at 2 (quoting *Margaretha Natalia Widjaja v.
16   JPMorgan Chase Bank, N.A.*, No. 19-7825, 2019 WL 8108716, at *7 (C.D. Cal. Nov. 19, 2019)).
17   "Multiple courts have applied the economic loss rule to bar a plaintiff's claim against a bank
18   arising from fraudulent activity." *Id.* (quoting *Widjaja*, 2019 WL 8108716, at *7). This
19   reasoning applies equally to the claims in Meisner's amended complaint despite his three
20   arguments to the contrary.

21   He first argues that because he requests some forms of relief that are not available in a
22   contract case, he should be permitted to pursue tort claims to obtain those remedies. *See* Opp'n at
23   14–15. He cites his requests for travel costs as well as tax and financial losses he incurred after
24   using tax-deferred retirement savings to fund his client trust account. *See id.* These harms are,
25   however, "purely economic"; that is, they represent a "pecuniary or commercial loss that does not
26   arise from actionable physical, emotional or reputational injury to persons or physical injury to
27   property." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 398 (2019) (citation omitted). These harms
28   are also among the intended target of damages in California contract law, which attempts to "put

10

the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the contract." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 967 (2004) (quoting 24 Williston on Contracts § 64:1 at 7 (4th ed. 2002)). In pursuit of that goal, contract damages include a "special" component. *See id.* at 968. Special damages take account of any "secondary or derivative losses arising from circumstances that are particular to the contract or to the parties" if the breaching party knew or should have known about those circumstances. *Id.* A sophisticated consumer bank in Chase's position—holding, as it did, all of Meisner's personal, business, and retirement accounts—could be expected to know that subtracting a large sum from one of his accounts would force him to pull funds from the other accounts to cover that loss, depriving him of tax and financial benefits in the process. Meisner could obtain all of the relief he seeks in a contract action, meaning his requests for relief do not justify his tort claims.

Second, Meisner argues the economic loss doctrine is no bar to his negligence claims because those claims fall within an exception to that doctrine for parties who share a "special relationship." Opp'n at 15–16. Although courts developed the exception he relies on for litigation between those who do not share a contractual relationship, *see S. Cal. Gas Leaks*, 7 Cal. 5th at 400, this court and others have entertained special-relationship claims by plaintiffs who had contracted with the defendants, *see, e.g.*, *NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1030 (E.D. Cal. 2013); *McMillan v. Connected Corp.*, No. 10-03297, 2011 WL 13213945, at *7–8 (C.D. Cal. May 18, 2011). Banks, however, "are not fiduciaries of their depositors," and at least one California court has held that "the bank-depositor relationship is not a 'special relationship'" that can give rise to tort damages. *Copesky v. Superior Court*, 229 Cal. App. 3d 678, 694 (1991). But that holding appears not to be universal, at least when it comes to claims for negligence and negligent misrepresentation. *See Wells Fargo Bank, N.A. v. FSI, Fin. Sols., Inc.*, 196 Cal. App. 4th 1559, 1572–73 (2011) (citing *Holcomb v. Wells Fargo Bank, N.A.*, 155 Cal. App. 4th 490, 496 (2007), in turn distinguishing *Copesky*). The court therefore assumes without deciding that the California Supreme Court could recognize the necessary "special relationship" between a bank and a depositor in the right circumstances.

California courts have considered six factors when deciding whether two parties share the necessary special relationship:

1. The extent to which the transaction was intended to affect the plaintiff,
2. The foreseeability of harm to the plaintiff,
3. The degree of certainty that the plaintiff suffered injury,
4. The closeness of the connection between the defendant's conduct and the injury suffered,
5. The moral blame attached to the defendant's conduct, and
6. The policy of preventing future harm.

*J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979); *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

At most, two of these factors weigh in Meisner's favor. Under the second factor, the harms he suffered were likely foreseeable to Chase, as discussed above. And under the third factor, he alleges injury with a high degree of certainty.

The remaining factors—one, four, five, and six—weigh against him. Under the first factor, nothing in the amended complaint suggests Chase's relationship with Meisner was different from its relationship with other account holders in similar situations. *See NuCal*, 918 F. Supp. 2d at 1031 (declining to find a "special relationship" despite the defendant's alleged knowledge about what the plaintiff would do with its product); *McMillan*, 2011 WL 13213945 at *8 (finding no special relationship because the plaintiffs did not "plead facts suggesting that defendants' service was intended to affect them differently than others who purchased the service"). Under the fourth factor, Chase's alleged conduct is not "close" to Meisner's injury. If Chase had done nothing at all—no hold, no investigation, no discussions with any other bank—Meisner would likely have suffered the same injury because Chase had a contractual right to recover the proceeds of the fraudulent check. Under the fifth factor, the amended complaint does not suggest Chase's conduct was blameworthy. If Meisner's allegations are true, then Chase was relying on reassurances it received from another large, sophisticated financial institution. It was likely in no better position to unmask the fraudster than Meisner. Chase also warned Meisner

unambiguously that its employees could not guarantee that any check was valid. Finally, under the sixth factor, the policy against preventing future harms does not favor Meisner. A bank has no incentive to play unwitting accomplice to a check fraud. When a fraudster vanishes with the proceeds of a fake check, a bank stands to lose money as well. Meisner's argument based on a "special relationship" does not exempt him from the economic loss doctrine.

Meisner's third argument against the economic loss rule relies on *Erlich v. Menezes*, 21 Cal. 4th 543 (1999). *See* Opp'n at 16. In that case, the California Supreme Court held that homeowners "may not recover damages for emotional distress based upon breach of contract to build a house." *Id.* at 548. It reaffirmed the distinction between contracts and torts and between contract and tort damages. *See id.* at 551. It also made clear that the "mere negligent breach of a contract" does not permit tort liability. *Id.* at 552. Rather, "a breach of contract is tortious only when some independent duty arising from tort law is violated." *Id.* at 554. Outside the insurance context, that may be true only if (1) a "breach is accompanied by a traditional common law tort, such as fraud or conversion," (2) the breach involved "deceit or undue coercion," or (3) the breach was intentional and the defendant knew it would cause "severe, unmitigable harm." *Id.* at 553–54 (citation omitted). Here, Meisner's allegations do not permit the inference that Chase intentionally deceived him, converted his assets, defrauded him, coerced him, or even breached its contractual obligations. *Erlich* is inapplicable. The economic loss doctrine bars Meisner's negligence claims.

Even if the economic loss doctrine did not bar Meisner's negligence claims, his amended complaint would not permit the court to infer that Chase was negligent. As noted above, Meisner alleges only that Chase did not discover the fraud. *See, e.g.,* FAC ¶ 48. No factual allegations suggest Chase's decision to remove the hold on the $135,000 check was negligently or wrongfully derived; rather it was allegedly only incorrect. Meisner does not claim the check bore any characteristic markers of fraud, and he does not identify any action that Chase could have but did not undertake to discover the fraud.

The two California appellate decisions Meisner relies on most heavily support this conclusion. The first decision is the Court of Appeal's unpublished decision in *Merchants Bank*,

13

discussed above. *See* Opp'n at 9. In that case, as here, the plaintiff asserted a negligence claim based on his allegation that a bank negligently overlooked a check fraud. *See* 2014 WL 4479741, at *2–3. The bank's demurrer was sustained, and that decision was undisturbed on appeal. *See id.* The second decision is *Holcomb*, 155 Cal. App. 4th 490. In *Holcomb*, the plaintiff alleged that a bank's branch manager told him a deposit had cleared, but in reality, the manager knew or should have known that another bank had already rejected the payment. *See id.* at 499–500. Meisner makes no similar allegation. He alleges the opposite: that Wells Fargo told Chase the check was valid. *See* FAC ¶ 16.

The reasoning in this section applies equally to both of Meisner's negligence claims. Both are dismissed.

**C.    Fraud**

Meisner also asserts two claims for fraud or deceit. The first is based on his allegation that Chase misrepresented the validity of the $135,000 check. *See* FAC ¶¶ 58–59. California courts have permitted misrepresentation claims against banks based on the banks' false statements about deposited checks. *See, e.g.*, *Wells Fargo*, 196 Cal. App. 4th at 1572–73; *Holcomb*, 155 Cal. App. 4th at 496–97; *cf. Mechanics Bank*, 2014 WL 4479741, at *5 ("The [California Uniform Commercial Code] does not preempt a common law claim for negligent misrepresentation based on a customer's detrimental reliance upon a bank employee's incorrect statements in connection with a deposit."). The elements of such a claim are the same as those a plaintiff must prove in any action for negligent misrepresentation: (1) the defendant misrepresented a material fact, (2) the defendant had no reasonable ground to believe that representation, (3) the defendant intended to induce the plaintiff's reliance on the misrepresented fact, (4) the plaintiff was justified in relying on the misrepresentation, and (5) as a result, the plaintiff was damaged. *Wells Fargo*, 196 Cal. App. 4th at 1573.

Meisner's amended complaint does not include factual allegations that, if true, would make out a plausible case of negligent misrepresentation based on Chase's statement that the check was valid. For two reasons, his allegations support the opposite conclusion. First, he alleges that Wells Fargo told Chase the check was valid, which forecloses an inference that Chase

14

had no reasonable ground to believe the check was valid. Second, the Deposit Account Agreement states unambiguously that Chase has no duty to determine whether a check is a fraud. It warns clearly that Chase employees cannot guarantee that a check is not a fraud. Meisner cannot plausibly allege he was justified in relying on Chase's alleged assurance that the check was valid or verified.

This case includes no allegations akin to the evidence that supported the viable claims in *Mechanics Bank*, *Wells Fargo* and *Holcomb*, the three cases Meisner relies on most heavily in defending his fraud claims. *See* Opp'n at 9–10, 16. In *Mechanics Bank*, the negligent misrepresentation claim went to trial based on evidence that bank employees had glanced only briefly at an unusually large check, ignored clear signs that the check was a counterfeit (such as misspellings and incorrect formatting), violated bank policies without reason, placed no hold on the funds at all, and reassured the account holder misleadingly that the check would "clear right away." *See* 2014 WL 4479741, at *2, 11–12. In *Holcomb*, as described above, a bank employee told the plaintiff account holder that the check had cleared, but he knew the opposite was true. *See* 155 Cal. App. 4th at 499–500. In *Wells Fargo*, it was undisputed on appeal that the bank had mispresented the status of the dishonored check in question; only the calculation of damages was in dispute. *See* 196 Cal. App. 4th at 1568 & n.6. Meisner's amended complaint includes no similar factual allegations. His first deceit claim, negligent misrepresentation, is dismissed.

In Meisner's second deceit claim, he alleges Chase persuaded him to open a Private Client account by promising him "rights and benefits" beyond those offered to "ordinary customers." FAC ¶ 63; Opp'n at 17. According to his amended complaint, Chase promised to employ its "expertise and resources to protect [him] from fraudulent transactions." FAC ¶ 63. California law recognizes false promise claims based on the allegation that "a defendant fraudulently induce[d] the plaintiff to enter into a contract." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Deceit claims based on false promises have the same elements as misrepresentation claims more generally. *See* Cal. Civ. Code § 1710(4); *Lazar*, 12 Cal. 4th at 638.

Applying those elements here, Meisner could succeed only if his allegations permitted the plausible inference that Chase said it would protect him from fraud but had no such intention.

15

Although he alleges this was so, the documents attached to his amended complaint show otherwise. As summarized above, the booklets and pamphlets about Chase's Private Client services describe "premium banking," "expertise and investment capability," and "special privileges and services," FAC Ex. A at 128, but they do not describe any fraud-detection expertise or services related to check deposits. *See supra* section III.A at 6. Meisner does not allege he learned any contrary information before opening his accounts, for example in a conversation with some Chase employee. He does not allege that Chase withheld the contracts, booklets, and pamphlets attached to his amended complaint until he had already become an account holder. No allegations suggest he could prevail in a false promise claim. Both fraud claims are dismissed.

### D.     Promissory Estoppel

Meisner's promissory estoppel claims are based on the same factual allegations as his misrepresentation claim, i.e., that Chase promised to use reasonable care to detect fraudulent checks and breached that promise. *See* FAC ¶ 38. A promissory estoppel claim must rest on allegations of the plaintiff's reasonable reliance on a promise. *See Graham-Sult v. Clainos*, 756 F.3d 724, 749 (9th Cir. 2014) (citing *U.S. Ecology, Inc. v. State*, 129 Cal. App. 4th 887 at 901 (2005)). As explained in the previous section, Meisner's allegations do not permit the inference that Chase promised to detect fraudulent checks. Nor do his allegations show he would have been justified in relying on that promise given the expressly contrary terms in the Deposit Account Agreement. This claim is dismissed as well.

### E.     Unfair and Fraudulent Business Practices

California law permits plaintiffs to seek injunctions against and restitution for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200; *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003). Meisner's theory of Chase's liability under section 17200 is the same as the theory underlying his misrepresentation and false promise claims. *See* FAC ¶¶ 68–74, 78. As explained above, that theory is not supported by plausible factual allegations. This claim is dismissed.

### IV.  CONCLUSION

The amended complaint is dismissed in total.  Under Rule 15 of the Federal Rules of Civil Procedure, leave to amend should be "freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Leave to amend may be denied if an amendment would be futile or if the plaintiff has already been permitted to amend the complaint.  *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008); *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir. 1989).  The shortcomings described in this order are unlikely to be cured by amendment.  The terms of the relevant contracts clearly and unambiguously contradict Meisner's factual allegations, the economic loss rules bars his tort claims, and the court has already permitted Meisner to amend his original complaint to address these shortcomings.  At hearing, he did not explain what additional relevant facts he might allege in an amended complaint.  The complaint is thus **dismissed without leave to amend.**

This order resolves ECF No. 16.

The Clerk's Office is instructed to **close this case.**

IT IS SO ORDERED.

DATED:  March 18, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE